UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG WYSOCKI,

                Plaintiff,

CASE NO. 13-CV-14505
HONORABLE GEORGE CARAM STEEH

v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DOC. #11), GRANTING
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DOC. #15) AND DISMISSING CASE

This matter is before the court on the parties' cross-motions for summary judgment.[1] Plaintiff Craig Wysocki appeals from the final decision of the defendant Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Wysocki claims disability beginning August 13, 2010 as a result of severe left knee injury and arthritis. For the reasons that follow, the court will deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment.

I. BACKGROUND

Plaintiff is a 44-year-old male who applied for DIB and SSI on March 14, 2011, at which time he was 42 years old, claiming he was unable to work because of "[s]evere left

---

[1] The motions were initially referred to a magistrate judge for a report and recommendation. The court withdrew the reference to the magistrate judge. (Doc. #17).

-1-

knee injury and arthritis." (Tr. 132–147, 163).[2] Plaintiff has not worked since August 13, 2010. (Tr. 163). He has an eleventh grade education, and "C tep" and "CDL" training, which allows him to work with propane. (Tr. 163–64). Plaintiff has worked in sales and service positions in the past, most recently self-employed as a landscaper. (Tr. 164). He has not worked since August 13, 2010.

A. Plaintiff's Medical History

Plaintiff underwent surgery on his right anterior cruciate ligament ("ACL") over twenty years ago and has a long-documented history of bilateral knee pain eventually leading in total arthroplasty (knee replacement surgery) in both knees. (Tr. 252). Plaintiff underwent "at least five to six surgeries per knee" from 1990 to 1994 because of meniscus tears, cartilage injuries and ACL repairs. (Tr. 58).

Plaintiff's knee injuries were aggravated in a work accident in 2010. On August 14, 2010, plaintiff reported to the Otsego Memorial Hospital complaining that he twisted his left knee and hit his head after falling four-to-five feet from a ladder. (Tr. 260). He described the pain as "sharp" and "stabbing." (Tr. 261). X-rays of plaintiff's left knee showed "[a]dvanced osteoarthritic change and moderate-sized joint effusion." (Tr. 265). There was "[n]o evidence of acute fracture," but there was "[e]vidence of prior ACL repair." (Tr. 265). Plaintiff was diagnosed with an acute left knee strain and instructed to wear a knee immobilizer, and to ice and elevate his knee. (Tr. 267). He was discharged from the hospital on the same day and given prescriptions for Vicodin and Motrin. (Tr. 266).

---

[2] Citations refer to the page numbers of the administrative record. For example, the citation "TR 132–147" refers to pages 132 through 147 of the administrative record.

Plaintiff returned to Ostego Memorial Hospital on August 24, 2010 due to pain that he characterized as being "8 out of 10" and he was treated by Dr. Louis S. Habryl, D.O. (Tr. 271). He requested stronger pain medication because the pain was interfering with his ability to sleep. (Tr. 271). Dr. Habryl discussed plaintiff's treatment options with him—physical therapy, testing and arthroscopy—and he prescribed him Percocet for pain, to take every six to eight hours for 30 days. (Tr. 274). Plaintiff returned to Dr. Habryl again on September 2, 2010 complaining of constant pain. (Tr. 275). X-rays showed "[s]ignificant degeneration changes of the medial compartment and patella femoral left knee." (Tr. 275). Plaintiff was prescribed Ambien to sleep at night. (Tr. 280). In addition, Dr. Habryl recommended an arthroscopy of the left knee, and, until the surgery, to keep soaking the left knee. (Tr. 280).

On February 10, 2011, a few days prior to the scheduled arthroscopy surgery, plaintiff visited Shelly R. Slivinski, a physician assistant at Ostego Memorial Physician Services, complaining of aching pain in the left knee. (Tr. 252, 281). Plaintiff told Slivinski that he slipped on ice that morning causing the pain to increase. (Tr. 252).

Plaintiff underwent arthroscopy surgery with Dr. Habryl on February 14, 2011, and, in a follow-up visit with Slivinski on February 22, 2011, plaintiff reported that his left knee pain was 5 to 6 out of 10. (Tr. 286). Plaintiff's diagnosis post-surgery was a torn meniscus and lateral meniscus, as well as loose body formation present. (Tr. 442). Plaintiff continued to undergo physical therapy for the left knee and receive pain medications, including injections of Euflexxa, and he was given workouts to complete at home. (Tr. 290, 335, 353). After the surgery, plaintiff reported that his left knee pain had improved, and that

he had less swelling and less pain. (Tr. 363). Plaintiff informed Dr. Habryl that he was "very happy" with the left knee replacement surgery. (Tr. 375, 380).

Plaintiff's medical records also reveal that he has had problems with his right knee. On August 16, 2011, plaintiff visited Slivinski complaining of right knee pain. (Tr. 341). X-rays showed that plaintiff suffered from localized primary osteoarthritis of the right knee. (Tr. 345). Slivinski gave plaintiff a 60 mg cortisone shot which was injected into the right knee, and plaintiff was told to return in two weeks for a Euflexxa injection if the pain persisted. (Tr. 345). On November 3, 2011, plaintiff reported to Slivinski with right knee pain stating that he was putting more pressure on the right knee because of the pain he was experiencing in his left knee. (Tr. 366). Subsequently, on November 22, 2011, plaintiff visited Dr. Habryl and discussed replacing the right knee. (Tr. 375). At that time, plaintiff told Dr. Habryl that he was happy with the left knee replacement and wanted to undergo the same procedure for the right knee. (Tr. 375).

On January 23, 2012, plaintiff had right knee replacement surgery. (Tr. 386, 397). Post-surgery x-rays showed that the procedure was successful. (Tr. 385). Plaintiff expressed his happiness after the surgery, and he stated that his knee was getting better. (Tr. 386). In multiple follow-up visits, it was noted that plaintiff was doing well overall (Tr. 381).

In addition to the knee problems, Plaintiff's medical records reveal that he also complained of low back pain. On December 27, 2011, Plaintiff visited Filter stating that he had back pain for the past six years. (Tr. 311). Despite having cortisone injections in the back, plaintiff continued to report that he was experiencing back pain. (Tr. 314). Testing at Mercy Hospital showed "anterolisthesis grade 1 of L5 on S1 with moderately severe

narrowing at the L5-S1 level. . . There is mild narrowing at L4-L5." (Tr. 318). On February 23, 2012, plaintiff treated with Dr. John DiBella for his back and knee pain. (Tr. 453). Dr. DiBella stated that plaintiff has "a radiculopathy at L4-5 and/or L5-S1 on the right side along with a prominent sacroilitis on the right side." (Tr. 454). Dr. DiBella began treatment with steroid injections. (Tr. 454).

There is also some mention in plaintiff's medical records of depression and anxiety. On October 29, 2011, plaintiff visited Filter reporting depression and anxiety. (Tr. 308). The record, however, does not detail any treatment plaintiff received for depression or anxiety.

On May 16, 2012, Filter filled out a medical source statement. (Tr. 403). In the statement, Filter detailed plaintiff's knee and back problems, and also checked that plaintiff suffers from depression, anxiety and psychological factors affecting his physical condition. (Tr. 404). Filter circled that plaintiff could sit and stand for 30 minutes, and he checked that, in an 8-hour work day, plaintiff could sit for about 4 hours and stand/walk for about 2 hours. (Tr. 404). Filter opined that, during each workday, plaintiff would be required to walk every 30 minutes for a period of 10 minutes, and that plaintiff would need 3-4 unscheduled breaks a day. (Tr. 404). Filter also checked the boxes that plaintiff could never lift more than 10 pounds, and that he could only occasionally lift less than 10 pounds. (Tr. 405).

Lisa Petrie, a physical therapist at Northsport Physical Therapy, completed a functional capacity evaluation summary report on June 18, 2012, at Dr. Habryl's request. (Tr. 407). Petrie opined that plaintiff's "subjective reports of pain and associated disability [are] both reasonable and reliable." (Tr. 407). Petrie further opined that plaintiff "is not

capable of performing the physical demands of the target job of 'Landscaper[.]'" (Tr. 408). Petrie stated that plaintiff could tolerate sitting or standing for 30-minute increments, that he could lift and carry up to 10 pounds, and that he had an inability to crouch or kneel. (Tr. 408). Petrie concluded that plaintiff is best suited for sedentary work where he would only have to exert up to 10 pounds of force, and where he could sit most of the time. (Tr. 408).

B. The Administrative Proceedings

1. The initial disability determination

Plaintiff's claims were denied on May 20, 2011 after being reviewed by single decision maker Mathew Branch. (Tr. 68, 76). Plaintiff was informed:

> Your condition results in some limitations in your ability to perform work related activities. While you are not capable of performing work you have done in the past, you are able to perform work that is less demanding. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work.

(Tr. 86, 90).

2. The hearing before the administrative law judge

Plaintiff requested a hearing before an administrative law judge ("ALJ") to review the denial of his claims. (Tr. 94). Plaintiff was given a hearing on July 5, 2012 before ALJ James J. Kent. (Tr. 107). Prior to the hearing, plaintiff's attorney submitted a brief to the ALJ, summarizing plaintiff's treatment history and his physical limitations. (Tr. 240). Plaintiff's attorney argued that plaintiff's "claim for disability arises out of an injury to both of his knees as well as his low back. . . ." (Tr. 240).

Plaintiff testified at the hearing, as did Richard Riedl, an impartial vocational expert.

At the time of the hearing, Plaintiff was 42 years old. Plaintiff testified that he is divorced with four children. (Tr. 47). He has a commercial driver's license and received heating and cooling certification in the past. (Tr. 48). He testified that he was not currently working; he stopped working since he fell off of the ladder on August 13, 2010. (Tr. 49). In addition, plaintiff testified that he did not have a current source of income. (Tr. 49).

As to his physical limitations, plaintiff testified that he occasionally goes grocery shopping (Tr. 49), and that he has the ability to carry 5 to 10 pound potato bags. (Tr. 50). Plaintiff said that he had a five-week old son who weighed 10 pounds, and that he was able to pick him up. (Tr. 50). Plaintiff also stated that he could sit and stand for approximately 30 minutes, occasionally moving around to become comfortable, but that walking was more difficult. (Tr. 50). He testified that he could only walk a couple-hundred feet before having to stop. (Tr. 50). Plaintiff said he could drive short distances. (Tr. 51). He did not have any problems breathing, and his vision was okay with the use of glasses. (Tr. 52–53).

Plaintiff also testified to anxiety and depression. (Tr. 53). Plaintiff stated that, starting two weeks before the hearing, he began treating for anxiety and depression. (Tr. 54). Plaintiff testified that being in public or in small groups bothers him. (Tr. 53). However, he said that he would not have a problem working in a small room with three workers that he knew. (Tr. 55). Plaintiff also testified to having a problem with his memory (i.e. he forgets daily tasks and needs constant reminders). (Tr. 54).

The ALJ gave plaintiff a hypothetical job where he would be sitting down watching surveillance tapes. In the hypothetical job, plaintiff would be given one break for 15 minutes in four hours, and the ability to leave the work station for five minutes or less at a time. (Tr. 56). Plaintiff stated that he would find the hypothetical job to be "extremely

difficult." (Tr. 56). Plaintiff testified that he would need a break for longer than five minutes every half hour, so that he could sit in a chair or lay in a bed, while elevating his feet. (Tr. 56–57). Plaintiff also testified that, at least four days a month, he would not be able to attend work because of the pain. (Tr. 57).

In response to questioning from his attorney, plaintiff testified that the injections he received for his back pain did not help in controlling the severity and frequency of the pain. (Tr. 58–59). Plaintiff testified that he was receiving treatment for his back pain with Dr. Habryl. (Tr. 59).

Next, the vocational expert testified and was given a hypothetical scenario by the ALJ. The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as plaintiff, who is limited to working at the sedentary level. (Tr. 62). Further, the individual

> can lift up to 10 pounds occasionally. He does require a sit/stand option. He can stand for 30 minutes, sit for 30 minutes. He is limited in the amount of time, space, and distance he can walk. So, he would have a sit/stand alternate at will option provided the person is not off-task more than 10 percent of the work period. He can occasionally climb ramps and stairs. He can never climb ladders, ropes, and scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can only occasionally reach. He can only occasionally reach overhead, and he can only occasionally handle objects defined as gross manipulation. He does have to avoid extreme cold, and heat, and humidity, and he has to avoid concentrated use of vibrating tools. This individual is able to understand, remember, and carry out normal instructions. He's able to make judgments on normal work related decisions. He's able to interact appropriately with supervisors and coworkers in a routine work setting, and he is able to respond to usual work situations and changes in a routine work setting. Could an individual with those limitations perform claimant's past work as it was actually performed or per the DOT?

(Tr. 62–63).

The vocational expert responded that the hypothetical claimant would not be able to perform any of plaintiff's past work experience. (Tr. 63). However, assuming the same vocational functions and limitations, the vocational expert testified that there are other jobs

available in the national economy. (Tr. 64). The vocational expert stated that the hypothetical claimant could work as a surveillance system monitor, an unskilled receptionist/information clerk or as an unskilled production inspector, jobs which are available in Michigan. (Tr. 64).

The ALJ then added the following to the hypothetical: the claimant has to be reminded of tasks two to three times a day and would lose focus three to four times a day, such that he would have to be allowed to be off task 15 percent or more of the day in addition to regularly scheduled breaks. (Tr. 65). The vocational expert testified that there would be no available work for the hypothetical claimant with these additional limitations. (Tr. 65). In addition, the vocational expert stated that there were no jobs available if the claimant needed unscheduled work breaks or the need to be off of work for four or more days per month, or if the claimant was unable to sit, stand and walk for eight hours a day. (Tr. 65–67).

### 3. The ALJ's denial of benefits

The ALJ applied the five-step sequential evaluation process for determining whether plaintiff is "disabled" as defined by the Social Security Act. At step one, the ALJ was required to consider whether plaintiff is engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b)). The ALJ found that plaintiff had not engaged in substantial gainful activity since August 13, 2010, the alleged onset date of his disability. (Tr. 32).

At step two, the ALJ was required to determine whether plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ concluded that plaintiff has two severe impairments: status-post left knee injury and osteoarthritis. (Tr. 32). These severe impairments, according to the ALJ, were supported by medical evidence and plaintiff's

testimony, and they significantly limit his ability to perform basic work activities. (Tr. 32). However, as to plaintiff's alleged back injury, the ALJ reasoned that the objective medical findings "failed to support a minimal duration of twelve months or a degree of limitation which significantly limits [plaintiff's] mental or physical ability to perform work related activities . . . ." (Tr. 32).

Next, at step three, the ALJ was required to consider whether all of plaintiff's impairments—severe and non-severe—met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed compensable impairment under the Social Security Act. (Tr. 33). The ALJ considered listing 1.02, "Major dysfunction of a joint," but concluded that "[t]he record does not demonstrate gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints. . . ." (Tr. 33). The ALJ also considered listing 1.04, "Disorders of the spine," finding that plaintiff did not demonstrate compromise of a nerve root. (Tr. 33).

At step four, the ALJ was required to determine whether plaintiff has the residual functional capacity ("RFC") to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Relatedly, at step five, the ALJ was required to determine whether plaintiff has the RFC to perform any available work in the national economy, given plaintiff's age, education and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The ALJ at step four concluded that plaintiff is unable to perform any past relevant work. (Tr. 37). However, after considering all of the evidence, the ALJ opined at step five that plaintiff could perform available sedentary work commensurate with his

limitations. (Tr. 33). In reaching this conclusion, the ALJ made an RFC finding that plaintiff:

> could lift up to 10 pounds occasionally. He could stand 30 minutes or sit 30 minutes. The claimant would require a sit-stand option at will provided that he is not off-task more than 10% of the workday. He could occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs but never climb ladders, ropes, or scaffolds. The claimant could occasionally reach overhead, reach, or handle (defined as gross manipulation). He should avoid all exposure to extreme temperatures and humidity. The claimant should avoid concentrated exposure to vibrating tools. He could understand, remember, and carry out normal instructions, make judgments on normal work-related decisions, and respond to usual work situations and changes in a routine work setting. The claimant could interact appropriately with supervisors and co-workers in a routine work setting.

(Tr. 33). Based on the vocational expert's testimony at the hearing about the available work in the national economy for someone with such limitations, the ALJ concluded that other work exists in significant numbers in the national economy. (Tr. 38). Therefore, the ALJ found that plaintiff was not disabled as defined by the Social Security Act.

### 4. Appeals Council denies review

Plaintiff requested the Appeals Council review the ALJ's decision denying benefits. (Tr. 20). On August 29, 2013, the Appeals Council declined to review the ALJ's decision rendering the decision final. (Tr. 1).

### C. This Lawsuit

Plaintiff filed this lawsuit on October 28, 2013, seeking judicial review of defendant's final decision denying benefits. The parties have filed cross motions for summary judgment. The motions are ready for decision. The court's analysis is set forth below.

## II. LEGAL STANDARD

Judicial review of a Social Security disability benefits application is limited to determining whether "the commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). A reviewing court may not resolve conflicts in the evidence or decide questions of credibility. *Brainard v. Sec'y of HHS*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a scintilla but less than a preponderance." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 399 (1938). "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009). The substantial evidence standard is deferential and "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference with the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

When determining whether the commissioner's decision is supported by substantial evidence, the reviewing court must take into consideration the entire record as a whole. *Futernick v. Richardson*, 484 F.2d 647, 649 (6th Cir. 1973). If the Appeals Council declines to review the ALJ's decision, the court's review is limited to the record and evidence before the ALJ, *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993), regardless if the ALJ actually cited to the evidence. *Walker v. Sec'y of HHS*, 884 F.2d 241, 245 (6th Cir. 1989). Nonetheless, there is no requirement that the reviewing court discuss all of the evidence in the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

### III. ANALYSIS

Plaintiff argues that the ALJ erred in multiple aspects of his decision denying benefits. Defendant, on the other hand, argues that the ALJ's decision is supported by substantial evidence and should be affirmed. Plaintiff alternatively seeks a "sentence six" remand[3] to proffer additional evidence for consideration of his back disability. The court considers the arguments in turn.

A. Severity Of Plaintiff's Claimed Back Injury

First, plaintiff says that the ALJ erred at step two of the sequential analysis in declining to find that his back pain and radiculopathy were severe. Plaintiff bears the burden of proof at step two of the sequential analysis in establishing a severe impairment. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009).

Plaintiff points to his treatment records from December 27, 2011, when he reported having back pain for the last 6 years, which had, according to plaintiff, become worse in the preceding month. (Tr. 311). Plaintiff also points to medical records in which he characterized his back pain as being "chronic." (Tr. 318).

Determining whether an impairment is "severe" under step two of the analysis is a *de minimus* hurdle. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). A plaintiff establishes a severe impairment if he shows that the impairment "is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* Here, even if the ALJ erred in finding that plaintiff's back pain was not "severe"—i.e. that it did not *minimally* affect plaintiff's work ability—the ALJ found other severe impairments at step two (left knee injury and osteoarthritis). As a result, at step three, the ALJ was required and did consider the effect of all severe and non-severe impairments, including plaintiff's back pain, pursuant to Social Security Ruling 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the

---

[3] A sentence six remand is explained below.

adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Therefore, if there was error in characterizing plaintiff's back impairment as "non-severe," the error was harmless. *Nejat*, 259 F. App'x at 577 ("And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does 'not constitute reversible error.'") (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Indeed, at step three, the ALJ explicitly considered listing 1.04, "Disorders of the spine." Plaintiff's argument, therefore, is without merit.

B. ALJ's Assessment Of Credibility And RFC Findings

Plaintiff next challenges the ALJ's assessment of his credibility, and the ALJ's RFC findings leading to the conclusion that plaintiff can perform a limited range of sedentary work. The ALJ did not err in either regard.

1. Plaintiff's credibility

As it relates to his credibility, plaintiff first takes issue with the ALJ's conclusion that plaintiff could engage in some driving, shopping, reading, watching television and computer use. Plaintiff argues that "[t]here was no indication . . . that [he] was able to engage in any of these activities on a regular and sustained basis, which is what the Social Security Regulations are concerned with." Pl's. Mot. at 16 (citation omitted). Plaintiff's argument has no merit because he testified at his hearing that he had the ability to engage in the above activities. Plaintiff testified that he could "drive . . . short distances" (Tr. 51), watch television and movies (Tr. 54–55), read a newspaper and write a letter (Tr. 47–48), and occasionally go grocery shopping with the ability to lift up to 10 pounds (Tr. 49–50). In addition, in a function report completed by plaintiff, he stated that he is able to ride in a car

(Tr. 193), shop for groceries and personal hygiene products (Tr. 193), and read, use the computer and watch birds *every day* (Tr. 194). The ALJ's conclusion, therefore, is supported by plaintiff's own testimony.

Plaintiff next disagrees with the ALJ's statement that plaintiff's treatment has generally been successful in controlling his symptoms. But the ALJ's conclusion is supported by substantial evidence. There are multiple medical records showing that plaintiff's pain subsided with treatment. After undergoing the left knee replacement surgery, x-rays showed that plaintiff's knee was "well aligned and well fixated." (Tr. 360). During a follow up visit, it was noted that the left knee was "overall much improved, less swelling, less pain." (Tr. 363). Indeed, it was noted that plaintiff "has improved in ROM and swelling since last appointment, continue use of pennsaid and celebrex as directed." (Tr. 365). And when plaintiff was discussing with Dr. Habryl the right knee replacement surgery, he stated that he was "very happy" with the left knee replacement. (Tr. 375, 380). Likewise, after plaintiff's right knee replacement surgery, x-rays showed successful results. (Tr. 385). In a follow-up visit, Dr. Habryl's notes state that the "[p]atient states that he is happy with the surgery performed and that his knee is getting better." (Tr. 386). The pain was down to 6 out of 10 as opposed to 9 out of 10 that it had consistently been in the past. (Tr. 386). In another follow-up visit, Dr. Habryl noted that the "[p]atient is doing well with his total knee and happy with his result. Continue PT to develop a home program, continue daily exercise for increased motion, recheck in one year with xray of bilateral knees." (Tr. 394). Although plaintiff continued to report some pain in his knees, the treatment records show that the pain got better with treatment, and that plaintiff was reporting "improvement overall." (Tr. 381). The ALJ's finding, therefore, is supported by substantial evidence.

2. The ALJ's RFC finding

Plaintiff challenges the ALJ's RFC finding as unsupported by substantial evidence. As explained above, the ALJ made a RFC finding in determining whether plaintiff has the RFC to perform his past work or other work available in the national economy. As part of this finding, the ALJ concluded that the evidence shows that plaintiff: could lift up to 10 pounds occasionally; could stand 30 minutes or sit 30 minutes; would require a sit-stand option at will provided that he is not off-task more than 10% of the workday; could occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs but never climb ladders, ropes, or scaffolds; could occasionally reach overhead, reach, or handle (defined as gross manipulation); should avoid all exposure to extreme temperatures and humidity; should avoid concentrated exposure to vibrating tools; could understand, remember, and carry out normal instructions, make judgments on normal work-related decisions, and respond to usual work situations and changes in a routine work setting; and could interact appropriately with supervisors and co-workers in a routine work setting. Based on this RFC assessment and the vocational expert's testimony at the hearing, the ALJ concluded that plaintiff could perform a limited range of sedentary work.

Plaintiff argues that, in making this RFC finding, the ALJ failed to give weight to his treating provider, physician assistant Jeffrey Filter, who opined that plaintiff would need to walk for 10 minutes every 30 minutes, take unscheduled breaks for 15 minutes three to four times a day, and be off task for 25% or more of each day. After summarizing plaintiff's treatment with Filter, the ALJ concluded that "[t]his opinion is not well supported by the treatment notes, appears to be from a short-term treating relationship, and is not consistent with the substantial evidence as a whole as it relates to the claimant's overall function and course of treatment. Therefore, I gave this opinion only some weight." (Tr. 36). The ALJ's rejection of Filter's conclusions was not in error.

-16-

First, Filter is not a "treating source" as defined by the regulations. An ALJ must give controlling weight to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)" where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating source as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. A list of "acceptable medical sources" is contained in 20 C.F.R. § 404.1513(a), and the list does not include physician assistants. *See LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 385 (6th Cir. 2013). Therefore, Filter is not a treating source, and his opinion is not presumptively entitled to controlling weight.

Second, the ALJ properly discounted Filter's opinion. Filter's conclusions were based on plaintiff's subjective complaints of pain as opposed to objective medical findings. As explained, the objective medical findings showed that plaintiff's impairments were getting better with treatment. In fact, plaintiff himself reported to his doctor that he was happy with both knee replacement surgeries. Filter did not explain, by pointing to objective medical evidence, why he believed plaintiff needed unscheduled breaks every 15 minutes or the need to be off task 25% of the workday. The ALJ did not err in discounting Filter's findings that are unsupported by the objective medical evidence, and contrary to plaintiff's own statements to his doctor.

Plaintiff also takes issue with the ALJ's reliance on the conclusion of Lisa Petrie, a physical therapist who completed a functional capacity evaluation at Dr. Habryl's request.

As explained, Petrie opined that plaintiff could not perform his prior work as a landscaper, was limited to lifting up to 10 pounds, and could sit/stand for 30 minutes at a time. Petrie concluded that plaintiff could perform work at a sedentary level. The ALJ recognized that Petrie is not an acceptable medical source as defined by the regulations, but he found her ultimate conclusion that plaintiff could perform sedentary work to be consistent with the objective clinical findings and other evidence. Plaintiff argues that the ALJ erred because he stated that he was giving Petrie's opinion great weight, but he relied only on the portion of Petrie's report that concluded plaintiff could perform sedentary work. If the ALJ considered the entirety of Petrie's report, plaintiff argues, he could have only concluded that plaintiff is disabled. However, Petrie's conclusion that plaintiff could perform sedentary work is consistent with plaintiff's testimony and the medical records described above. Therefore, the ALJ correctly relied on Petrie's ultimate conclusion that plaintiff could perform sedentary work. To the extent that Petrie's report can be interpreted as making a finding that plaintiff is completely disabled, it is not supported by the objective medical evidence.

In sum, plaintiff's challenges to the ALJ's RFC assessment do not withstand scrutiny. The ALJ's RFC assessment is supported by substantial evidence. The court's role is not to look at the evidence anew; rather, if the ALJ's decision is supported by substantial evidence, it must be affirmed, even if the evidence could support a decision the other way. *Casey*, 987 F.2d at 1233.

C. Plaintiff's Request For Sentence Six Remand

Plaintiff alternatively requests a remand under 42 U.S.C. § 405 (a "sentence six remand") for evaluation of new and material evidence that was submitted by his prior attorney to the Appeals Council, but not included as part of the administrative record.

Particularly, plaintiff seeks remand for consideration of Dr. Abid Khan's medical records dated 4/9/2013 through 4/11/2013, which according to plaintiff, substantiate his claim that he has continuing back pain, and which were not available at the time the ALJ rendered his decision.

Under § 405, the court "may . . . at any time order additional evidence be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." It must be shown "(I) that the evidence at issue is both 'new' and 'material,' and (ii) that there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477 (6th Cir. 2006) (citations omitted). "New" evidence means that the evidence was not in existence or available to the claimant at the time of the administrative proceeding. *Id.* And it is "material" if "'there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (citation omitted). Good cause requires the claimant to provide "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* at 485 (citation and internal quotation marks omitted).

> Here, the commissioner persuasively argues that Dr. Khan's opinion is not material:
>
> Dr. Khan's medical source statement is dated April 11, 2013, nine months after the period adjudicated in the ALJ's decision (Tr. 18, 38). In fact, Dr. Khan did not even begin treating Plaintiff until February 28, 2013, over seven months after the ALJ's decision and only one and a half months before rendering his opinion (Tr. 15). Although Dr. Khan represented that Plaintiff's restrictions dated back to 2010 (Tr. 18), he provided no justification for this conclusion, and it runs contrary to the substantial record evidence documenting substantial improvement in Plaintiff's condition following his bilateral total knee arthroplasty operations. This is inadequate to meet

-19-

> Plaintiff's burden of demonstrating that the additional evidence is material to the period at issue in the ALJ's decision. [citation omitted].

Def's. Mot. at 18–19. Indeed, the new evidence plaintiff seeks to submit is from April, 2013, which does not reveal further information about his ability to perform light or sedentary work for the time period considered by the ALJ. *See, e.g.*, *Oliver v. Sec'y of HHS*, 804 F.2d 964, 966 (6th Cir. 1986).

Moreover, plaintiff did not establish good cause for failing to obtain Dr. Khan's statement prior to the ALJ's decision. That the medical treatment records were obtained after the hearing is not, standing alone, a valid reason for meeting the good cause test. *Oliver*, 804 F.2d at 966. Plaintiff does not address the good cause element in seeking a sentence six remand. For these reasons, the court declines to remand this case under sentence six.

### IV. CONCLUSION

For the reasons stated above, the court DENIES plaintiff's motion for summary judgment (Doc. #11), GRANTS defendant's motion for summary judgment (Doc. #15) and DISMISSES this case.

IT IS SO ORDERED.

Dated: October 29, 2014

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 29, 2014, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---